**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| PENNSYLVANIA NATIONAL | : | |
| MUTUAL CASUALTY INSURANCE | : | |
| COMPANY | : | |
| | : | |
| v. | : | CIVIL NO. CCB-09-2610 |
| | : | |
| CITY HOMES, INC., *et al*. | : | |
| | : | |
| | ...o0o... | |

**<u>MEMORANDUM</u>**

Now pending are cross-motions for summary judgment.  Pennsylvania National Mutual Casualty Insurance Company ("Penn National") filed the instant declaratory judgment action against City Homes, Inc. ("CHI") and Barry Mankowitz (collectively with CHI, "City Homes") seeking a determination that it does not owe a duty to defend or indemnify them in the underlying lawsuit, *Dontae Rico Wallace, et al. v. Kennedy Krieger Inst., Inc., et al.*, case number 24-C-07-002026, in the Circuit Court for Baltimore City ("the *Wallace* case").[1]  In response, CHI and Mr. Mankowitz filed a counterclaim seeking a declaration that Penn National does, in fact, have a duty to defend and indemnify them.  Both sides have moved for summary judgment on their claims.  For the following reasons, City Homes' motion will be granted, and Penn National's motion will be denied.[2]

---

[1]    The claimants in the underlying *Wallace* case, Dontae Wallace and S.W., a minor, are also named as defendants in the present matter.  Neither Dontae Wallace, nor S.W., has responded to the complaint.

[2]    Penn National has also moved to exclude as inadmissible hearsay Exhibits 1, 3, 4, 5, 11, 14 & 16 to City Homes' cross-motion for summary judgment.  Each of these exhibits is from the underlying *Wallace* case: Exhibit 1 is the original complaint; Exhibit 3 is the first amended complaint; Exhibit 4 is the second amended complaint; Exhibit 5 is the third amended complaint; Exhibit 11 is the deposition of Barry Mankowitz; Exhibit 14 is the deposition of Earnest Matthews; and Exhibit 16 is the deposition of Tiffini Howard.  Because the court finds the

# BACKGROUND

*I.     The Underlying Wallace Case*

CHI is a corporation that owns and manages low-income rental properties in Baltimore, Maryland.  Mr. Mankowitz was the president of CHI at all times relevant to this lawsuit.  On March 22, 2007, Dontae Wallace and his sister S.W., filed a lawsuit against City Homes, among others, alleging that they were exposed to lead paint as minors while residing at a house located at 2234 Booth Street in Baltimore City ("the Property") between July 1993 and 1997, which was owned and managed by CHI at the time.  The case went to trial in October 2009 on counts of negligence and negligent misrepresentation against City Homes, and resulted in a judgment against City Homes on November 3, 2009.  Due to juror misconduct, however, the Circuit Court for Baltimore City ultimately dismissed the verdict and ordered a new trial, which is scheduled for January 2011.

The Property was a subject property in the "Lead-Based Paint Abatement and Repair & Maintenance Study" ("R&M Study" or "Study") defined in the Environmental Protection Agency's publication No. 747-R-97-005.  The Study recognized that children living in homes with deteriorating lead-based paint and elevated dust lead levels were at the highest risk of exposure to lead, and was designed to compare the short-term and long-term effectiveness of a range of housing interventions "to reduce children's exposure to lead in residential paint and settled house dust."  (Penn Mot. Ex. B at FOST 425.)  An effort to respond to the "acute shortage

---

remaining uncontested evidence dispositive, it will deny Penn National's motion *in limine* as moot, and will not consider the contested evidence in its analysis.

    The court notes, however, that Penn National has moved to exclude the pleadings from the *Wallace* case only to the extent that they were relied upon by City Homes as substantive evidence.  (*See* Penn Reply at 9-10.)  Accordingly, the court will consider the allegations in the third amended complaint (Exhibit 5), not as substantive evidence, but solely for the purpose of determining the duty to defend.

of affordable housing free of lead-based paint in many urban areas, and the high costs of complete lead-based paint abatement", the Study's "preventative R&M approach" was intended to "provide a means of reducing exposure for future generations of U.S. children who will continue to occupy housing that contains lead-based paint." (*Id.*) It included two control groups: (1) presumably lead-free urban houses built after 1979, and (2) previously abated houses; it also included three groups with different levels of R&M intervention. For ethical reasons, the Study did not include a non-intervention control group. The Study's objective was to "[a]ssess children's blood level concentrations associated with the three levels of R&M interventions and the two control groups." (*Id.* at FOST 426.)

The first level of intervention, R&M I, involved wet scraping of peeling and flaking lead-based paint on interior surfaces; limited repainting of scraped surfaces; wet cleaning and high efficiency vacuuming; provision of an entryway mat; provision of information to occupants; and stabilization of exterior lead-based paint to the extent possible. R&M II included two additional elements: floor treatments to make them smoother and easier to clean and window and door treatments to reduce abrasion of lead-painted surfaces. Last, R&M III also included window replacement and encapsulation of exterior window trim with aluminum coverings, encapsulation of exterior door trim, and the use of more durable floor and stair coverings.

The Property was approved as a residence in the R&M Study, and Dr. Susan Kleinhammer of the Kennedy Krieger Institute developed the scope of intervention for the Property, based on an XRF report and a visit to the home. On April 1, 1993, the Property was tested for the presence of lead, and several areas tested positive for lead. No defective paint of any kind was found. The Property then underwent a lead-abatement intervention at the R&M II level. After the remediation work was completed by a contractor, Dr. Kleinhammer "would

visually go back, and [] would look at all of the components, all of the treatments that were done, and would not sign off on it unless they were done according to the way that they were supposed to be done, and actually carried out according to the scope of work that was created." (City Homes Mot. Ex. 12, 10/23/09 A.M. at 11: 21 – 12: 2.)

Dr. Kleinhammer testified in the *Wallace* case that dust samples tested on June 23, 1993, and taken from the Property after the remediation work was complete, were well below the required "post-abatement clearance standards" set forth by the Maryland Department of the Environment at that time. (*Id*. at 20: 4 – 21: 4.) She further testified that following the R&M II intervention, the Property was "lead-safe . . . by that definition and those times." (*Id*. at 21: 5-9.) Dr. Kleinhammer stated that "[w]e had made all paint in good condition. We had treated friction surfaces, and we had made sure that all the dust samples were below standards set by Maryland." (*Id*. at 21: 9-12.) She confirmed this in a letter to Mr. Mankowitz, which indicated that the house at 2234 Booth Street had "satisfactorily met post abatement clearance standards." (City Homes Mot. Ex. 18.)

On June 16, 1993, Tiffini Howard, mother of Dontae and S.W., applied to lease the Property. Ms. Howard met with Earnest Matthews, Tenant Coordinator at CHI, when she applied to lease the Property, and she testified that she informed Mr. Matthews that she was looking to move because her old home had lead paint. (Penn Mot. Ex. C, 10/14/09 P.M. at T-79: 17-20.) She further testified that she thought the Property was "lead safe", which she understood to mean that her "kids would be safe from getting any lead poisoning. That the house would be free from lead." (*Id*. at T-79: 12-16.) Rico Wallace, Ms. Howard's husband and the children's father, testified that if he had been advised by the landlords that the Property contained lead paint he would not have rented it. (*Id*., 10/13/09 A.M. at 32: 19-22.)

Mr. Mankowitz testified that he never sent anyone to advise the Wallace family of the areas of lead paint at the Property. (*Id.*, 10/19/09 A.M. at 11: 19-22.) But he also testified that CHI employees showed tenants a video about the dangers of lead poisoning and how to stop lead dust. (*Id.*, 10/15/09 P.M. at 92: 22 – 93: 4.) Mr. Mankowitz stated that CHI gave tenants a mop, a bucket, rubber gloves, a sponge and TSP,[3] and explained to them that they needed to keep the floors free of dust. (*Id.* at 94: 16-20.) Furthermore, Mr. Matthews, who actually met with Ms. Howard before she leased the Property, testified that he told Ms. Howard that "the house was lead safe", which "simply means [that] upon the property being tested and City Homes receiving an MDE, Maryland Department of Environment, certification that the house was deemed lead safe, after the test was taken". (City Homes Ex. 15, 10/30/09 P.M. at 28: 1-6.) Mr. Matthews noted that "that doesn't mean that lead is not in the home. It means that the lead was not exposed and there was no evidence of lead exposure during that time." (*Id.* at 28: 6-9.) Both Mr. Mankowitz and Mr. Matthews testified that they were aware of the dangers lead poses to children.

On June 22, 1993, Ms. Howard signed a lease for the Property. On that same date, Ms. Howard also signed a certification form acknowledging that she had received a presentation on lead paint risks. (*See* City Homes Mot. Ex. 19.) On July 3, 1993, Dontae and S.W. moved into the Property with their mother, and Mr. Wallace moved in a few months later. Ms. Howard testified in the *Wallace* case that shortly after moving in she contacted CHI on three occasions to complain of problems with the Property. Specifically, she testified that she called the rental office and left a message about the ceiling falling in from water damage. (Penn Reply Mem. Ex. AA at T-63: 8-19.) In addition, she testified that she called the rental office on July 22, 1993

_____

[3]     TSP stands for trisodium phosphate detergent, a cleaning agent used as part of all levels of intervention in the R&M Study. (*See* Penn Mot. Ex. B. at FOST 413.)

about chipping paint on the inside of the bathtub. (*Id*. at T-69: 7 – T-70: 13.) Last, she testified that she called the rental office on July 26, 1993 about a rat hole under the kitchen sink. (*Id.* at T-72: 11-18.)

Entered into evidence as part of Ms. Howard's testimony were three messages taken down by the CHI employee who received Ms. Howard's phone calls. (*See* Plaintiffs' Exs. 35, 37 & 38 from the *Wallace* Case, entered as docket entry no. 32.) But none of these messages mentioned anything about problems with paint at the Property, chipping, flaking, or otherwise. (*See id*.) For instance, the message about the ceiling was jotted down as: "ceiling in closet is falling; check pipe in kitchen underneath; vent in living room crate come out." (*Id.*) Moreover, Ms. Howard's call about the bathtub was written down as: "basement pipe need to be repipe [sic] low pressure; tub over flow plate missing refinish tub". (*Id*.) Last, the message regarding the rat hole was recorded as: "patch hole under kitchen sink. Rat got in." (*Id*.) The record also includes testimony by Ms. Howard that at least the latter two problems were fixed by the landlord, albeit not immediately. (*See* Penn Reply Mem. Ex. AA at T-70: 14-20; T-111: 7-8.) The family moved out of the Property in November 1995.

## II.     *The Present Declaratory Judgment Action*

Penn National issued an insurance contract that included commercial general liability coverage to City Homes in connection with certain real estate, including the Property. It is undisputed that the insurance contract covered the time period at issue in the *Wallace* case. In relevant part, the insurance contract stated:

> 1.  Insuring Agreement
>     a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result…

. . .

    b.  This insurance applies to "bodily injury" and "property damage" only if:

        i.  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

       ii.  The "bodily injury" or "property damage" occurs during the policy period.

2.  Exclusions

    This insurance does not apply to:

    a.  "Bodily injury" or "property damage" expected or intended from the standpoint of the insured…

(Penn Mot. Ex. D.)  The contract also included the following definition:

9.      "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(*Id*.)  On or about May 25, 2007, Penn National sent City Homes a reservation of rights letter with regard to the *Wallace* case.  Although Penn National has never withdrawn from its defense of City Homes in the *Wallace* case, Penn National argues in the present action that it does not owe a duty to defend or indemnify City Homes because the *Wallace* case does not involve an "occurrence" as defined in the insurance contract.  In the alternative, Penn National argues that even assuming the *Wallace* case involved an "occurrence", the insurance contract's exclusion for bodily injury that was expected or intended by the insured applies.  In response, City Homes seeks a declaration that under the terms of the contact Penn National does, in fact, owe a duty to defend and indemnify it in the *Wallace* case.

## <u>ANALYSIS</u>

I.    *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c)(2). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.* In cases involving contract disputes, "summary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." *Washington Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

## II.    *Duty to Defend and Indemnify*

The promise to defend and indemnify the insured "is the consideration received by the insured for payment of the policy premiums." *Clendenin Bros., Inc. v. United States Fire Ins.*

*Co.*, 889 A.2d 387, 392 (Md. 2006) (internal quotation marks and citation omitted).[4]  In

Maryland, "the duty to defend is broader than the duty to indemnify."  *Walk v. Hartford Cas. Ins.*

*Co.*, 852 A.2d 98, 106 (Md. 2004).  Whereas a company has a duty to defend its insured for all

claims that are *potentially* covered under an insurance contract, *Sheets v. Brethren Mut. Ins. Co.*,

679 A.2d 540, 542 (Md. 1996) (emphasis added) (citing *Brohawn v. Transamerica Ins. Co.*, 347

A.2d 842, 850 (Md. 1975)), the duty to indemnify, *i.e.*, pay a judgment, attaches only upon

liability.  *Walk*, 852 A.2d at 106; *see also Cowan Sys., Inc. v. Harleysville Mut. Ins. Co.*, 457

F.3d 368, 372 (4th Cir. 2006).

The Maryland Court of Appeals has set forth a two-part test to determine whether an

insurer has a duty to defend: "(1) what is the coverage and what are the defenses under the terms

and requirements of the insurance policy? [and] (2) do the allegations in the tort action

potentially bring the tort claim within the policy's coverage?"  *Sheets*, 679 A.2d at 542 (citing *St.*

*Paul Fire & Mar. Ins. v. Pryseski*, 438 A.2d 282, 285 (Md. 1981)).  "The first question focuses

upon the language and requirements of the policy, and the second question focuses upon the

allegations of the tort suit."  *Id.* (internal quotation marks and citation omitted).

As part of the first prong of the court's inquiry, insurance contracts are construed as a

whole to determine the parties' intentions and words in the contract are given their "customary,

ordinary, and accepted meaning unless there is an indication that the parties intended to use the

words in a technical sense."  *Id.* at 543 (internal quotation marks and citation omitted).  Where an

analysis of the contract language shows that the contract's terms are plain and unambiguous, the

court will determine their meaning as a matter of law.  *Clendenin*, 889 A.2d at 393.  But where

---

[4]     The parties agree that Maryland law governs the insurance contract at issue, as it was
made in Maryland.  *See Allstate Ins. Co. v. Hart*, 611 A.2d 100, 101 (Md. 1992) ("Maryland
courts ordinarily should apply the law of the jurisdiction where the contract was made. This is
referred to as the principle of *lex loci contractus*").

the contract's terms are ambiguous, the court may consider extrinsic evidence in its analysis. *Id*. Maryland does not follow "the view of construing an insurance policy most strongly against the insurer". *Id*. at 394 (internal citation omitted). Nevertheless, the Maryland Court of Appeals has stated that "any doubt as to whether there is a potentiality of coverage under an insurance policy is to be resolved in favor of the insured." *Id*. (citing *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 656 A.2d 779, 786 (Md. 1995)). Pursuant to the second part of the inquiry, a court must examine the complaint and any extrinsic evidence to determine whether there is a potentiality of coverage. *Sheets*, 679 A.2d at 543.

The insurance policy issued to City Homes by Penn National provides coverage for sums that City Homes "becomes legally obligated to pay as damages because of 'bodily injury'". (*See* Penn Mot. Ex. D.) Only bodily injury that "is caused by an 'occurrence' that takes place in the 'coverage territory'", and is "during the policy period" is covered. (*Id*.) The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions", but does not define "accident." (*Id*.) In relevant part, the third amended complaint in the *Wallace* case alleges that City Homes' negligence and negligent misrepresentation caused the plaintiffs' lead-poisoning injuries. (*See* City Homes Mot. Ex. 5.) Accordingly, at issue here is whether the bodily injuries alleged in the *Wallace* case were caused by an "occurrence" such that Penn National owes a duty to defend and indemnify City Homes.

The Maryland Court of Appeals held in *Sheets* that "an act of negligence constitutes an 'accident' under a liability insurance policy when the resulting damage was an event that takes place without the insured's foresight or expectation." 679 A.2d at 548 (internal quotation marks and citation omitted). In determining what constitutes an accident, the court rejected an objective standard, which would exclude coverage for "damage that *should have* been foreseen

or expected by the insured", because such a standard would render insurance policies "all but meaningless." *Id*. at 549 (emphasis in original). Rather, the court held that the critical inquiry is subjective: whether the insured actually foresaw or expected the damage caused by the negligent act. *Id*. at 548. An accident need not be "the consequence of the use of accidental means." *Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.*, 235 A.2d 556, 558 (Md. 1967) (citing *Haynes v. Am. Cas. Co.*, 179 A.2d 900 (Md. 1962)). Instead, an intentional act may nevertheless cause an accidental injury if something unforeseen, unusual and unexpected produces the result. *Id*.

Penn National acknowledges that, typically, a bodily injury resulting from exposure to lead paint meets the definition of an "occurrence" under general liability insurance contracts in Maryland. *See, e.g., Chantel*, 656 A.2d at 786. But relying on *Harleysville*, it argues that the instant case is unique. Penn National contends that CHI's participation in the R&M Study, which it portrays as having exposed some children to more lead than others, and the testimony of Mr. Mankowitz and Mr. Matthews that they were aware of the hazards that lead posed to children, demonstrate that the injuries alleged in the *Wallace* case must have been foreseen and expected by City Homes.

In *Harleysville*, an action to recover on a liability insurance policy, the insured, Harris & Brooks, Inc. ("H&B"), was contracted to "clear, burn and smooth up" a wooded tract of land, and in so doing caused damage to neighboring properties. 235 A.2d at 556-57. H&B cleared the trees, put them into 10-12 foot piles, poured fuel over the piles and set them afire. *Id*. at 556. Rubber tires were added to the piles, which burned for 36 hours, and resulted in damage to residential properties nearby. *Id*. On these facts, the Maryland Court of Appeals held that the damage was not caused by an "accident." *Id*. at 559. It reasoned that H&B "took no

11

precautionary measures", and that "a contractor who piles trees and underbrush in 10 to 12 foot piles, adds fuel oil and rubber tires, and permits the fires to burn for 36 hours before they are extinguished should be charged with the responsibility of foreseeing that a pall of smoke and soot will result, which may damage adjacent properties." *Id*. The court distinguished *Haynes*, where a contractor pointed out a property line to his employees, left the site, and returned to find that they had encroached on an adjacent property and had cut down 48 trees. *Id*. at 558. There, the Maryland Court of Appeals determined that the damage was caused by an accident because the contractor could not be charged with having foreseen that his employees would cross the line and trespass. *See Haynes*, 179 A.2d at 903-904. In *Harleysville*, the court also distinguished two other cases where precautionary measures had been taken to prevent clearly foreseeable results. 235 A.2d at 558-59 (citing *Cross v. Zurich Gen. Accident & Liab. Ins. Co.*, 184 F.2d 609 (7th Cir. 1950) & *O'Rourke v. New Amsterdam Cas. Co.*, 362 P.2d 790 (N.M. 1961)).

Penn National argues that here, just as in *Harleysville*, the insured, City Homes, cannot claim that it did not foresee the resulting injury. Although *Harleysville* predates *Sheets* and the Maryland Court of Appeals' explicit adoption of a subjective standard for determining what constitutes an "accident", Penn National argues that the holding in *Harleysville* demonstrates that in some unique cases there are circumstances in which an insured could not have failed to perceive the consequences of its actions, and which will support a determination that the resulting damages were not accidental. In *Sheets*, the Court of Appeals did not overrule *Harleysville*, but suggested that it and other earlier cases were "less than clear in explaining the relevant inquiry" as to what constitutes an accident. *Sheets*, 679 A.2d at 548. The court explained that its analysis in *Harleysville* "might [have] indicate[d]" that it "considered whether the damage should have been foreseen by the contractor, but ultimately held that the damage was

actually expected or foreseen by him", and further stated that even if its prior cases had considered whether property damage or bodily injury *should have* been foreseen or expected by the insured, the relevant inquiry going forward would be subjective: whether the insured *actually* foresaw or expected the injury resulting from the insured's negligent act. *Id.* (emphasis added). For the reasons explained below, application of that standard to the record here shows that the lead poisoning alleged in the *Wallace* case was not foreseen or expected by City Homes and, thus, resulted from an accident.[5] Moreover, even if *Harleysville* still stands for the proposition that under certain circumstances an insured must be found to have foreseen the damages that resulted from its actions, that is not the situation here.

Although Penn National argues otherwise, it cannot be inferred from City Homes'

---

[5]    Penn National's argument that City Homes is collaterally estopped from arguing that the Property was safe from lead hazards because the jury in the *Wallace* case found that City Homes was liable for negligence and negligent misrepresentation is unavailing. To apply "collateral estoppel" or "issue preclusion" as to an issue or fact, the proponent must demonstrate that:

> (1) the issue or fact is identical to one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding.

*In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004). Even if the jury's finding were deemed final and valid, despite the fact that the Baltimore City Circuit Court has ordered a new trial in the *Wallace* case, collateral estoppel would not apply here because the issues litigated in the *Wallace* case are not identical to the one now before the court.

Whether City Homes was negligent and/or made a negligent misrepresentation with respect to the Property is not the same fact or issue as whether the lead poisoning alleged in the *Wallace* case was accidental. Although the same subject matter is involved, the questions are not identical for purposes of collateral estoppel, as the jury in the *Wallace* case was not asked to decide whether City Homes actually foresaw or expected the Wallace children's injuries. *See, e.g., Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir.1998) (holding that where the dispositive issue in an administrative proceeding was whether an accident occurred as the plaintiff alleged it did, collateral estoppel did not bar litigation of whether the accident was work-related because that issue had not yet been litigated). Accordingly, City Homes is not precluded from arguing that the Property was lead safe or that it did not know of the Property's allegedly dangerous condition.

participation in the R&M Study and knowledge of the risks of lead poisoning that City Homes foresaw the injuries sustained by the Wallace children. The R&M Study was designed specifically to "reduce children's exposure to lead in residential paint and settled house dust." (Penn Mot. Ex. B at FOST 425.) As part of the Study, the Property underwent R&M II intervention overseen by Dr. Kleinhammer, who thereafter deemed the Property "lead-safe", as defined at that time. Dr. Kleinhammer confirmed this in a letter to Mr. Mankowitz, stating that the Property had "satisfactorily met post abatement clearance standards." (City Homes Mot. Ex. 18.) It is undisputed that the Property contained lead paint and that City Homes knew of this fact, but there is nothing in the record showing that Mr. Mankowitz or anyone else at CHI thought the Property was unsafe for residents when it was rented to Ms. Howard. Rather, it appears that the only information available to City Homes at that time, Dr. Kleinhammer's analysis, suggested the Property was safe from lead hazards. It does not follow that simply because the R&M Study involved the comparison of lead-intervention treatments on children, City Homes actually foresaw or expected residents of the Property to be injured by lead poisoning.

To the contrary, City Homes' participation in the Study indicates an effort to ensure that the homes it rented were safe from lead risks. In contrast to the facts of *Harleysville*, where the insured took no precautionary measures to prevent the resulting damages, the record here shows that City Homes made efforts to test the Property for lead and to remediate it before Ms. Howard and her family moved in. The record also shows that City Homes informed Ms. Howard of the risks of lead poisoning, and educated her on keeping the Property safe. Mr. Matthews testified that he told Ms. Howard the Property was "lead safe" before she rented it, which he understood not to mean that the home was lead-free, but rather that "the lead was not exposed and there was

no evidence of lead exposure during that time." (City Homes Mot. Ex. 15, 10/30/09 P.M. at 28: 1-9.) Penn National has not put forth any evidence suggesting that Mr. Matthews told Ms. Howard anything other than what he believed to be true based on the remediation efforts and tests done as part of the R&M Study.

Furthermore, it is not reasonable to infer that City Homes foresaw or expected the Wallace children's injuries simply because Ms. Howard informed CHI that certain repairs were needed early in her tenancy. Although it is clear from the record that Ms. Howard called CHI's rental office about maintenance problems at the Property, the messages written down by the rental office do not indicate that anyone at CHI had knowledge of any chipping paint or other known lead hazards. Moreover, the evidence shows that CHI corrected the problems of which it had been made aware. The court reiterates that under the subjective standard set forth in *Sheets*, it is irrelevant whether City Homes *should have* foreseen the injuries sustained by Dontae and S.W. Because there is no evidence before the court that City Homes had actual knowledge of lead hazards at the Property, it would be unreasonable to infer that City Homes foresaw or expected the injuries.

Accordingly, this case is not uniquely different from other Maryland cases involving lead poisoning. Rather, the bodily injuries alleged in the *Wallace* case were accidental, and caused by an "occurrence."[6] Penn National, therefore, has a duty to defend City Homes. Although the issue of indemnification is premature because a new trial has been ordered in the *Wallace* case, *see Walk*, 852 A.2d at 106 (explaining that "the duty to indemnify depends upon liability"), a declaratory judgment is nonetheless warranted. *See Chantel*, 656 A.2d at 788. The court holds that if City Homes ultimately is found liable for negligence and/or negligent misrepresentation,

---

[6] The insurance policy's exception for injuries that were expected or intended by the insured does not apply for the reasons already stated.

Penn National will owe a duty to indemnify City Homes for any judgment against it.

## **CONCLUSION**

For the foregoing reasons, Penn National's motion will be denied and City Homes' motion will be granted.  A separate Order follows.


|          June 25, 2010          |              /s/                |
|:---:|:---:|
| Date | Catherine C. Blake |
|  | United States District Judge |